**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

BRYAN HANLEY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

TAMPA BAY SPORTS AND ENTERTAINMENT LLC, a Delaware limited liability company,

Defendant.

CASE NO.________________________

**JURY TRIAL DEMANDED AND INJUNCTIVE RELIEF SOUGHT**

## CLASS ACTION COMPLAINT

Plaintiff Bryan Hanley ("**Plaintiff**"), individually and on behalf of all other persons similarly situated, complains and alleges as follows:

## NATURE OF ACTION

1. Professional sports team owners critically depend on fan engagement to build team and brand loyalty, expand fan bases, fill stadium seats, maintain ratings, and sell apparel. Eager to stay on their fans' minds, team owners increasingly skirt their obligations under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("**TCPA**") and deploy intrusive telephone marketing strategies to maintain the fan engagement they rely on. Defendant Tampa Bay Sports and Entertainment LLC ("**Defendant**") is one such team owner.

2. Plaintiff brings this action for statutory damages and other legal and equitable remedies resulting from the illegal actions of Defendant Tampa Bay Sports and Entertainment LLC in transmitting advertising and telemarketing text messages to Plaintiff's cellular telephone and the cellular telephones of numerous other similarly situated persons using an automatic telephone dialing system ("**ATDS**") and without anyone's prior express written consent, in violation of the TCPA.

## PARTIES

3. Plaintiff is, and at all times relevant hereto was, an individual and a "person" as defined by 47 U.S.C. § 153(39), a citizen and resident of Tampa, Florida, and the subscriber and user of the cellular telephone number (631) ***-1151 (the "**1151 Number**").

4. Defendant is, and at all times relevant hereto was, a limited liability company organized under the laws of Delaware and a "person" as defined by 47 U.S.C. § 153(39). Defendant's primary place of business is in Tampa, Florida. Defendant is the owner of the Tampa Bay Lightning, a professional ice hockey team based in Tampa, Florida and a member of the Atlantic Division of the Eastern Conference of the National Hockey League (the "**Lightning**"). The Lightning play their home games in the Amalie Arena in Tampa, Florida, which the Defendant operates.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

6. This Court has subject matter jurisdiction over this action pursuant to 47 U.S.C. § 227(b)(3).

7. Defendant is subject to personal jurisdiction in Florida because its principal place of business is in Florida and its affiliations in Florida are so continuous that it is at home here. Not only are the Lightning identified by a city in Florida, i.e., the Tampa Bay Lightning, the Lightning play their home games in a stadium in Florida that they operate.

8. Defendant is additionally subject to personal jurisdiction in Florida because this suit arises out of and relates to Defendant's contacts with this State. Defendant initiated and directed, or caused to be initiated and directed by its agent(s), telemarketing and/or advertising text messages into Florida, via an ATDS and without the requisite prior express written consent, in violation of the TCPA. Specifically, Defendant initiated and directed, or caused to be initiated and directed by its agent(s), the transmission of unsolicited advertising or telemarketing SMS text messages to the 1151 Number in order to sell products and services in Florida. Plaintiff received such messages while residing in and physically present in Florida.

9. Plaintiff's claims for violation of the TCPA against Defendant, and the resulting injuries caused to Plaintiff by Defendant's advertising and telemarketing messages, which includes the invasion of Plaintiff's privacy, arose in substantial part from Defendant's direction of those messages into Florida.

10. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district. Venue is also proper in this judicial district

under 28 U.S.C. § 1391(b)(2) because a substantial part of Defendant's actions and omissions which gave rise to the claims asserted in this action occurred here.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

11. To address consumer complaints regarding certain telemarketing practices, Congress enacted the TCPA, 47 U.S.C. § 227, in 1991. The TCPA prohibits, *inter alia,* making any call, or sending any text message, to a wireless number via an ATDS absent an emergency or the prior express written consent of the party called.

12. By enacting the TCPA, Congress made specific findings that "unrestricted marketing can be an intrusive invasion of privacy" and a "nuisance." Telephone Consumer Protection Act of 1991, Pub. L. 102-243, § 2, ¶¶ 5, 10, 12, 13, 105 Stat. 2394 (1991); *see also Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 132 S. Ct. 740, 745, 181 L. Ed. 2d 881 (2012). Through the TCPA, Congress sought to protect consumers from the unwanted intrusion and nuisance of unsolicited telemarketing calls and advertisements. *See* Pub. L. 102-243, § 2, ¶ 12.

13. According to findings by the Federal Communications Commission ("**FCC**"), which is vested with authority to issue regulations implementing the TCPA, autodialed calls and texts are prohibited absent the requisite consent because such transmissions are a greater nuisance than live solicitation calls, and receiving and addressing such calls and texts can be costly and inconvenient.

14. According to a recent study conducted by the Pew Research Center, "[s]pam isn't just for email anymore; it comes in the form of unwanted text messages of all kinds - from coupons to phishing schemes - sent directly to user's cell phones."

Indeed, one of the most prevalent bulk advertising and telemarketing methods employed by companies today involves the use of "Short Message Services" (or "**SMS**"), which is a system that allows for the transmission and receipt of short text messages to and from wireless telephones.

15. SMS text messages are directed to a wireless device through a telephone number assigned to the device. When an SMS message is successfully transmitted, the recipient's wireless phone alerts the recipient that a message has been received. Because wireless telephones are physically carried by their owners, SMS text messages are received virtually anywhere in the world.

16. Unlike more conventional advertisements, advertising and telemarketing SMS text messages can actually cost their recipients money. This is because wireless phone users must either pay their wireless service providers for each text message they receive or incur a usage allocation deduction to their text messaging or data plan, regardless of whether the message is even authorized or wanted.

17. In 2013, in response to growing concern over unwanted advertisements and telemarketing material being sent to consumers via SMS text message, the FCC updated its rules on consent to require that companies obtain the "**prior express written consent**" of the recipient before using an ATDS to make any call or send any SMS text message that contains "advertisements" or "telemarketing." *See* 47 C.F.R. 64.1200(f)(8).

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

18. Defendant operates the Lightning, a National Hockey League team.

19. Defendant has developed and implemented advertisement and telemarketing campaigns which involve sending advertisements and telemarketing text messages to consumers' wireless telephones without first obtaining their prior express written consent.

20. Defendant uses the short code telephone number 61873 to operate its text message marketing campaigns and messages from Defendant are sent from telephone short code number 61873.

21. Defendant uses "bait and switch" tactics to lure consumers into an onslaught of marketing messages delivered straight to their phones without regard to whether the text recipients are driving, praying, or otherwise seeking solitude in their homes or elsewhere.

22. Generally, Defendant's "bait and switch" tactics convince fans to sign up to enter into prize sweepstakes or otherwise to receive purely informational texts. Once Defendant obtains access to its fans' cellular telephone numbers, however, Defendant enrolls the consumer into its text message marketing campaign which floods the recipient with nearly daily advertising and telemarketing text messages.

23. Plaintiff's experience is similar to thousands of other Lightning fans who were repeatedly sent unwanted marketing text messages.

24. Plaintiff saw the following Lightning opportunity to "Win Lightning Tickets!" to a December 6, 2018 hockey game:




25. The "WIN LIGHTNING TICKETS" advertisement displayed immediately above was created by or on behalf of Defendant to encourage persons to send a text message containing the word "PARENT" to the short code telephone number 61873.

26. Interested in "[w]in[ning] Lightning Tickets," Plaintiff followed the Lightning's instructions and used his cellular phone, which has been assigned the 1151 Number, to text the word "PARENT" to the short code telephone number 61873 "for a chance to win 4 tickets to the game, a Tampa Bay Lightning Fan Pack, and an exclusive seat visit from ThunderBug!"

27. After Plaintiff followed the Lightning's instructions, Defendant captured the 1121 Number through the use of a caller identification or an automatic

number identification device without notice to Plaintiff.

28. Nonetheless, in rapid response, Defendant sent Plaintiff two text messages from the short code telephone number 61873 to the 1121 Number:

**Bolts Text Club: 30msgs/mo. Msg&DataRatesMayApply. Consent to rcv msgs not a condition of purchasing goods/services. Reply HELP for help, STOP to end**

**Bolts Text Club: Rcv breaking news, pre-sales, offers, discounts. Complete coverage: http://nhl.com/lightning Msg&Data ratesMayApply. HELP for info. STOP to end**

29. The second text message contained a link to the official website of "The Tampa Bay Lighting" where the Defendant advertises, among other things, the sale of team branded clothing, ticket sales, and products. Plaintiff, however, did not want to, and surely did not consent in any way or to receive advertising and telemarketing text messages nor did Plaintiff consent to receive 30 such messages per month.

30. Moving forward, Plaintiff began to regularly receive marketing text messages on his cellular telephone, each of which advertised the commercial availability of Defendant's sports programming and/or was initiated to encourage Plaintiff to purchase Defendant's good or services, including tickets to its Lightning games, Lightning merchandise, or access to the Lightning's television programming.

31. For example, on November 26, 2018, Defendant sent the following three text messages to Plaintiff's cellular phone:

**Bolts TXT: Cyber Monday Bolts Tix start at $20 for 1/8 vs CBJ (bit.ly/2r7DUiU) or 1/10 vs CAR (bit.ly/2P7ZGNq) Use code MONDAY Msg&DataRatesMayApply STOP 2 end**

**Bolts TXT: Cyber Monday Bolts Tix start at $20 for 1/8 vs CBJ (bit.ly/2r7DUiU) or 1/10 vs CAR (bit.ly/2P7ZGNq) Use code MONDAY Msg&DataRatesMayApply STOP 2 end**

**Bolts TXT: Cyber Monday Retail Sale! Visit tampabaysports.com/cybermonday/ for access to 50 items at 50% off or more! Msg&DataRatesMayApply. STOP to end.**

32. The links in the SMS text messages that Plaintiff received on November 26, 2018 redirected him to a Ticket Master website where he was immediately asked "How many tickets" he wanted and "Whats your budget per ticket?"

33. The following day, on November 27, 2018, Plaintiff received another telemarketing text message on the 1151 Number, this one reading as follows:

**Bolts TXT: TBL vs. ANA TONIGHT @ 7:30PM. Watch live on Fox Sports Sun or via the Fox Sports App. Buy Tix: bit.ly/2qT4qwl Msg&DataRatesMayApply. STOP to end.**

34. Again, the link in the text message sent to the 1151 Number directed Plaintiff to a Ticket Master website which encouraged him to purchase tickets to Lightning games.

35. The onslaught continued. On November 29, 2018, Defendant sent another advertisement text message to Plaintiff's cellular phone:

**Bolts TXT: TBL vs. BUF TONIGHT @ 7:30PM. Watch live on Fox Sports Sun or via the Fox Sports App. Buy Tix: bit.ly/2QTrOWg Msg&DataRatesMayApply. STOP to end.**

36. Not lacking consistency, the link yet again directed Plaintiff to a Ticket Master website which encouraged him to purchase tickets to Lightning games.

37. On December 1, 2018, another message:

**Bolts TXT: TBL at FLA TONIGHT @ 7PM. Watch live on Fox Sports Sun or via the Fox Sports App. Listen on WFLA 970AM. Msg&DataRatesMayApply. STOP to end.**

38. Again, on December 3, 2018:

**Bolts TXT: TBL at NJD TONIGHT @ 7PM. Watch live on Fox Sports Sun or via the Fox Sports App. Listen on WFLA 970AM. Msg&DataRatesMayApply. STOP to end.**

39. Yet another on December 4, 2018:

**Bolts TXT: TBL at DET TONIGHT @ 7:30PM. Watch live on Fox Sports Sun or via the Fox Sports App. Listen on WFLA 970AM. Msg&DataRatesMayApply. STOP to end.**

40. No surprise, another message followed the next day on December 5, 2018:

**Bolts TXT: Special Ticket Offer. Tickets for this Mon 12/10 vs. NYR start at just $20. Use code TX1210 at bit.ly/2E5cZwe Msg&DataRatesMayApply. STOP to end.**

41. Plaintiff wanted to text the word "STOP" to end these messages from bombarding his cell phone, but he was afraid do so because he feared it might prevent him from winning tickets to the Lightning vs. Bruins hockey game.

42. December 6, 2018 came and went, and Plaintiff never heard back about the free hockey tickets he entered to win.

43. He did, however, receive another text message on his phone seeking to persuade him to watch the game:

**Bolts TXT: TBL vs. BOS TONIGHT @ 7:30PM. Watch live on Fox Sports Sun or via the Fox Sports App. Buy Tix: bit.ly/2zHOFgF Msg&DataRatesMayApply. STOP to end.**

44. Even though he did not win the four tickets to the Lightning vs. Bruins game he hoped to, he nonetheless had to put up with the intrusive text messages that Defendant sent to his phone.

45. And even after the Lightning vs. Bruins game took place, Defendant still continued to bombard Plaintiff with its marketing text messages.

46. For example, on December 8, 2018, Defendant caused the following message to be transmitted to Plaintiff's cellular phone assigned to the 1151 Number:

**Bolts TXT: TBL vs. COL TONIGHT @ 7PM. Watch live on Fox Sports Sun or via the Fox Sports App. Buy Tix: bit.ly/2RtAyCy Msg&DataRatesMayApply. STOP to end.**

47. And another one on December on December 10, 2018:

**Bolts TXT: TBL vs. NYR TONIGHT @ 7:30PM. Watch live on Fox Sports Sun or via the Fox Sports App. Buy Tix: bit.ly/2E5cZwe Msg&DataRatesMayApply. STOP to end.**

48. Once Plaintiff realized that he didn't win the sweepstakes he entered to win but was still receiving Defendant's annoying and intrusive marketing text messages, he texted the word "STOP" to short code 61873 on December 14, 2018.

49. However, more than simply confirm his "opted out" status, Defendant actually encouraged Plaintiff to re-opt-in as follows:

**Lightning, AmalieArena, Storm, StudentRush: You've been removed & will no longer receive msgs. Reply BOLTS, ARENA, STORM, or RUSH to rejoin Msg&DataRatesMayApply**

50. The complained of SMS text messages sent to the 1151 Number constitute advertisements as defined by 47 C.F.CR. § 64.1200(f)(1) because they advertise the commercial availability of Defendant's property, goods, and services.

51. The complained of SMS text messages sent to the 1151 Number constitute telemarketing as defined by 47 C.F.R. § 64.1200(f)(12) because at least one purpose of the text messages was to encourage the purchase of Defendant's property, goods or services.

52. The source of each of the unsolicited SMS text messages sent by Defendant to the 1151 Number was 61873, which is an SMS short code owned or leased by or on behalf of Defendant or Defendant's agent(s) or affiliate(s), and is used for operating Defendant's text message campaign, including the sending of SMS text messages telemarketing and advertising various of Defendant's goods and services.

53. All telephone contact by Defendant and/or affiliates, subsidiaries, or agents of Defendant to Plaintiff at the 1151 Number occurred via an ATDS

("automated telephone dialing system") as defined by 47 U.S.C. § 227(b)(1)(A) because the unsolicited telemarketing SMS text messages were sent from 61873, which is a short code telephone number used to message consumers *en masse*, and because the hardware and software used by Defendant to send such messages have the capacity to store, produce, and dial either random or sequential numbers, and to dial such numbers, *en masse*, in an automated fashion without human intervention. Further, the complained of SMS text messages were written in a generic and impersonal manner, thus demonstrating that the text messages were sent to numerous other consumers.

54. Defendant features its texting program on its Twitter account with Twitter handle "@TBLightning" where it has more than 683,000 "followers." Likewise, Defendant showcases its texting campaign on its Facebook page with Facebook identifier "@lightningnhl" where it has more than 560,900 "likes" and more than 531,000 "followers."

55. The complained of SMS text messages sent to the 1151 Number did not constitute calls made for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

56. Defendant's SMS text messages invaded Plaintiff's privacy, intruded upon his seclusion and solitude, constituted a nuisance, and wasted his time by requiring him to delete the messages. Further, Defendant's SMS text messages caused Plaintiff to incur tangible harms such as loss of cell phone battery life and financial losses in requiring him to recharge his phone. Finally, Defendant's SMS text

messages constituted a temporary electronic intrusion upon Plaintiff's cell phone.

57. Plaintiff has no reason to believe, that absent a Court Order, that Defendant would voluntarily stop violating the TCPA.

**CLASS ACTION ALLEGATIONS**

58. Plaintiff brings this lawsuit as a class action on behalf of himself individually and on behalf of all other similarly situated persons as a class action pursuant to F.R.C.P. 23(b)(3). The "Class" Plaintiff seeks to represent is comprised of and defined as:

> All persons who received an SMS text message, sent by or on behalf of Defendant or an affiliate, subsidiary, or agent of Defendant from a short code telephone number, including the short code telephone number 61873.

59. Excluded from the Class is the Defendant, any entity in which the Defendant has a controlling interest, or which has a controlling interest of the Defendant, and any of Defendant's legal representatives, assigns or successors. Also excluded is any judge presiding over this case and any member of any such judge's immediate family. Members of the Class are referred to as "Class Members."

60. Plaintiff reserves the right to modify the definition of the Class (or add one or more subclasses) after further discovery.

61. Plaintiff and all Class Members have been impacted and harmed by the acts of Defendant and/or its agents, affiliates or subsidiaries.

62. Plaintiff seeks injunctive relief and monetary damages on behalf of himself and the Class.

63. This action may properly be brought and maintained as a class action pursuant to Fed. R. Civ. P. 23(b)(3). This class action satisfies the numerosity, typicality, adequacy, commonality, predominance and superiority requirements.

64. Upon application by Plaintiff's counsel for certification of the Class, the Court may also be requested to utilize and certify subclasses in the interests of manageability, justice, and/or judicial economy.

65. Numerosity. The number of persons within the Class is substantial, believed to amount to thousands of persons dispersed throughout the United States. It is therefore impracticable to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impracticable. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.

66. Typicality. Plaintiff received from Defendant at least one SMS text message sent via an ATDS without providing his "prior express written consent" to receive "advertisement or "telemarketing" text messages via an "ATDS" within the meaning of the TCPA. Consequently, the claims of Plaintiff are typical of those of the other Class Members he seeks to represent, and Plaintiff's interests are consistent with and not antagonistic to those of the other Class Members he seeks to represent. Plaintiff and all Class Members have been impacted by, and face continuing harm out of, Defendant's violations and/or misconduct as alleged herein.

67. Adequacy. As Class representative, Plaintiff has no interests that are adverse to, or conflict with, the interests of the absent Class Members and is able to fairly and adequately represent and protect the interests of the Class Members. Plaintiff has raised viable claims of the type reasonably expected to be raised by the Class Members and will vigorously pursue those claims. If necessary, Plaintiff may seek leave to amend this Complaint to add additional representatives of the Class or assert additional claims.

68. Competency of Class Counsel. Plaintiff has retained and is represented by experienced, qualified and competent counsel committed to prosecuting this action. These counsel are experienced in handling complex class action claims, including class actions alleging violations of the TCPA.

69. Commonality and Predominance. There are well defined common questions of fact and law that exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from Class Member to Class Member and may be determined without reference to the individual circumstances of any class member, include (but are not limited to) the following:

a. Whether Defendant and/or any of its affiliates, subsidiaries, or agents transmitted advertising or telemarketing SMS text messages to Class Members' cellular telephones;

b. Whether the SMS text messages transmitted by Defendant and/or any of its affiliates, subsidiaries, or agents were transmitted using an

automatic telephone dialing system;

c. Whether Defendant and/or any of its affiliates, subsidiaries, or agents can prove they obtained prior express written consent (as defined by 47 C.F.R. 64.1200(f)(8)) to send the complained of text messages;

d. Whether Defendant's complained of conduct was knowing and/or willful;

e. Whether Defendant and/or any of its affiliates, subsidiaries, or agents should be enjoined from engaging in such conduct in the future.

70. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class Members is impracticable. Even if Class Members could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts for individual litigation of numerous cases to proceed. Individualized litigation also presents the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each Class Member. Plaintiff anticipates no difficulty in the management of this action as a class action. Class wide relief is essential to compel compliance with the TCPA. The interest of Class Members in individually controlling the prosecution of separate claims is small because the statutory damages in an individual action for violation of the TCPA are

small. Management of these class claims is likely to present significantly fewer difficulties than are presented in many individual claims because the text messages at issue are all automated and the Class Members, by definition, did not provide the prior express written consent required under the statute to authorize such text messages to their cellular telephones. The Class Members can be readily located and notified of this class action through Defendant's records and, if necessary, the records of cellular telephone providers.

71. Additionally, the prosecution of separate actions by individual Class Members may create a risk of multiple adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to such adjudications, thereby substantially impairing or impeding the ability of such nonparty Class Members to protect their interests. The prosecution of individual actions by Class Members could further establish inconsistent results and/or establish incompatible standards of conduct for Defendant.

72. Defendant and/or any of its affiliates, subsidiaries, or agents have acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class appropriate.

73. Moreover, on information and belief, the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE TCPA (47 U.S.C. § 227)
*(On Behalf of Plaintiff and the Class Against Defendant)*

74. Plaintiff hereby incorporates paragraphs 1-73 as if fully stated herein.

75. The foregoing acts and omissions constitute violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227.

76. Because of the Defendant's violations of 47 U.S.C. § 227, Plaintiff and all Class Members are entitled to, and seek, injunctive relief prohibiting such conduct violating the TCPA in the future.

77. Plaintiff and all Class Members are also entitled to, and seek, an award of $500.00 in statutory damages for each SMS message transmitted in violation of the TCPA pursuant to 47 U.S.C. § 227(b)(3).

78. Plaintiff and Class Members also seek an award of attorneys' fees and costs.

### SECOND CLAIM FOR RELIEF
### KNOWING AND/OR WILLFUL VIOLATION OF THE TCPA (47 U.S.C. § 227)
*(On Behalf of Plaintiff and the Class Against Defendant)*

79. Plaintiff hereby incorporates paragraphs 1-73 as if fully stated herein.

80. The foregoing acts and omissions constitute knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227.

81. Because of Defendant's knowing and/or willful violations of 47 U.S.C. § 227, Plaintiff and all Class Members are entitled to, and seek, injunctive relief

prohibiting such conduct violating the TCPA in the future.

82. Plaintiff and all Class Members are also entitled to, and seek, treble damages of up to $1,500.00 for each SMS message transmitted in violation of the TCPA pursuant to 47 U.S.C. § 227(b)(3).

83. Plaintiff and Class Members also seek an award of attorneys' fees and costs.

**PRAYER FOR RELIEF**

Plaintiff prays for relief and judgment in his favor, as follows:

A. Injunctive relief prohibiting such violations of the TCPA in the future;

B. As a result of the Defendant's violations of 47 U.S.C. §227(b)(1), Plaintiff seeks for himself and each Class Member $500.00 in statutory damages for each and every violative SMS text message;

C. As a result of the Defendant's willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiff seeks for himself and each Class Member treble damages, as provided by the statute, of up to $1,500.00 for each and every violative SMS text message;

D. An award of attorneys' fees and costs to counsel for Plaintiff and the Class; and

E. An Order certifying this action to be a proper class action pursuant to Fed. R. Civ. P. 23, establishing appropriate Class and any additional subclasses the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing Plaintiff's counsel as counsel for the Class.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the Class, hereby demands a jury trial on all issues so triable.

March 5, 2019

Respectfully submitted,

By: */s/ Ruben Conitzer*

**David P. Milian** (Fla. Bar No. 844421)
Email: dmilian@careyrodriguez.com
Secondary: ecf@careyrodriguez.com
**Juan J. Rodriguez** (Fla. Bar No. 613843)
Email: jrodriguez.@careyrodriguez.com
Secondary: cperez@careyrodriguez.com
**Ruben Conitzer** (Fla. Bar No. 100907)
Email: rconitzer@careyrodriguez.com
CAREY RODRIGUEZ MILIAN GONYA LLP
1395 Brickell Avenue, Suite 700
Miami, FL 33131
Telephone: (305) 372-7474
Facsimile: (305) 372-7475
*Counsel for Plaintiff Bryan Hanley*